## Case No. 15,481.

### UNITED STATES v. JOHNS.

[1 Wash. C. C. 363; 1  4 Dall. 412.]

Circuit Court, D. Pennsylvania. April Term, 1806.

VIOLATION OF SHIPPING LAWS — CASTING VESSEL AWAY — INDICTMENT — CHALLENGES OF JURORS — EVIDENCE AS TO INSURANCE—PROOF OF STATE LAWS.

1. Indictment for casting away and destroying a vessel, of which the defendant was owner, on the high seas, with intent to prejudice the underwriters. The defendant has a right to challenge thirty-five of the jurors; the number of challenges allowed at common law, in capital cases.

[Cited in U. S. v. Dow, Case No. 14,990.]

2. The law not making it an offence in the owner to destroy his vessel, to the prejudice of the underwriters on the cargo, no evidence can be given to establish a charge against the defendant, for such destruction, to the prejudice of the underwriters on the cargo; even if such a charge was contained in the indictment. Evidence of the value of the property insured, may be given, for the purposes of showing inducements to destroy or to preserve it.

3. The prosecutor must show that the insurance was a valid insurance; and if made by an incorporated company, the act of incorporation must be shown; and it must be shown, that the contract of assurance was executed, so as to bind the company.

[Cited in Re Kaine, Case No. 7,598.]

4. The president of the incorporated insurance company, by whom the property was assured, although a stockholder, may be a witness to prove the handwriting of the defendant, to the manifest of the cargo; because, the conviction of the defendant would not be evidence in a suit on a policy against the company.

[Cited in The Missouri, Case No. 9,653.]

5. A law of a state certified by the clerk of the executive council, and the seal of the state annexed, is good evidence of the law, according to the provisions of the act of congress, passed 26th May, 1790 [1 Stat. 122]. As to public acts of judicial bodies or others, except the laws or acts of a state, it directs who is to authenticate them.

6. The words in the indictment, that the defendant destroyed the vessel, "with intent to gain corrupt advantage to himself," are mere surplusage, and need not be proved. It is necessary to state that "the intent was to prejudice the underwriters."

7. The legal meaning of the term "destroy," as used in the act of congress, is to unfit the vessel for service, beyond the hopes of recovery, by ordinary means. This, as to the extent of the injury, is synonymous with "cast away." Both mean such an act as causes the vessel to perish,—to be lost,—to be irrecoverable by ordinary means.

[Cited in U. S. v. Vanranst, Case No. 16,608.]

8. Quere.—Whether a corporation is a person, within the meaning of the act of congress.

The defendant [Richard Johns] was indicted for casting away and destroying a vessel, on the high seas, of which he was owner, with intent to prejudice the Baltimore Insurance Company, who had underwritten there-

1 [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

on. There were four counts, the two first of which charged him, generally, with casting away and destroying his vessel, and differed from each other only in this, that he is charged with having directed, or procured it to be done. The 3d and 4th have the same difference, but they state the particular manner in which the destruction was caused, viz.: by boring three holes in her bottom.

[1. The defendant was brought, by habeas corpus, before the court, holding an adjourned session, on the 8th of January, 1806, when it appeared that, on the 26th of December, 1805, he had been committed by the mayor of the city of Philadelphia, charged on the oath of Andrew Clarke with having on the 20th day of August last, or thereabouts, on the high seas, scuttled the schooner Enterprise of Baltimore, with intention to defraud the underwriters, as he believes.] 2

Mr. Rawle, C. & J. R. Ingersoll, S. Levy, and Mr. Ewing, for defendant.

2 [The prisoner's counsel objected, 1st. That the commitment was vague, and did not describe the offence, within the words of the act of congress. 2d. That the offence was not committed within the district of Pennsylvania; and no demand having been made for his surrender by the executive of any other state, there was no law to warrant his arrest, or detention. 3d. That the evidence was not sufficiently strong, to found an indictment against him and he was entitled, at all events, to be discharged on bail.

[It was answered, by the attorney of the district, 1st. That whatever might be the formal defects of the original commitment, the court, being now satisfied with the evidence, would remand the prisoner for trial. 2d. That it was not necessary, for that purpose, to give positive proof of guilt; but to show probable cause for the accusation. 3d. That the case did not come, at all, under the constitutional, or legislative, provisions, for the surrender of a fugitive from the justice of another state; but it was the case of a crime against the United States, committed on the high seas; when the trial is directed to be in the district, where the offender is apprehended. 1 Stat. 113. § 8; Id. 91, 92, § 33.

[BY THE COURT. Upon a habeas corpus, we are only to enquire, whether the warrant of commitment states a sufficient probable cause to believe, that the person charged, has committed the offence stated. We have heard the evidence; and cannot doubt of its sufficiency to that extent. We do not think, that the prisoner ought either to be discharged, or bailed. He must be remanded for trial.] 2

Before the jury were sworn, it became a question, how many of them, the prisoner might challenge peremptorily. The counsel for the prisoner insisted, that he had a right to challenge thirty-five, this being the num-

ber which might be challenged in all capital cases at common law (4 Hawk. P. C. 389; 4 Bl. Comm. 353); and the act of congress (1 Stat. 113) which limits the number to twenty, refers expressly to the crimes therein mentioned; whereas this law was not passed till 1805.

Of this opinion was THE COURT.

2 [The clause, respecting challenges is in these words: "If any person, or persons be indicted of treason against the United States, and shall stand mute, or refuse to plead, or shall challenge peremptorily above the number of thirty-five of the jury; or if any other person or persons, be indicted of any other of the offences hereinbefore set forth, for which the punishment is declared to be death, if he or they shall so stand mute, or will not answer to the indictment, or challenge peremptorily above the number of twenty persons of the jury; the court, in any of the cases aforesaid, shall notwithstanding proceed to the trial of the person or persons so standing mute, or challenging, as if he or they had pleaded not guilty, and render judgment thereon accordingly."

[The attorney of the district, said he was indifferent which way the court decided the point; but it was proper to remark, that the 29th section of the judicial act referred, generally, to the state law, for the rule relating to juries (1 Stat. 88); that the state law limited the right of peremptory challenge, in cases like the present, to the number of twenty; that the 30th section of the penal act (1 Stat. 113) obviously considers the whole law of peremptory challenge provided for, in future, as well as existing, capital cases; and that it was improper to refer to a common law rule, if a rule was prescribed by statute.

[PETERS, District Judge. The words of the penal act, when they restrain the common law right of peremptory challenge, also expressly confine the operation of the restraint, to the offences before set forth in the act. For offences not set forth in the act, the only rule is furnished by the common law; and it is the privilege of the prisoner, that it should be applied and enforced.

[WASHINGTON. Circuit Justice. The right of challenge was a privilege highly esteemed, and anxiously guarded, at the common law; and it cannot be doubted, but that at the common law, a prisoner is entitled, on a capital charge, to challenge peremptorily, thirty-five of the jurors. If, therefore, the act of congress has substituted no other rule (and, in the present instance, it is clear that none has been substituted) the common law rule must be pursued. It is not easy, indeed, to assign a reason, for introducing the words, that confine the provision, respecting peremptory challenges, to offences before set forth in the act; but it is enough to bind our judgments, that the words are

actually introduced. In the case of U. S. v. Russel [Case No. 16,209], on an indictment for murder on the high seas, tried at October term, 1806, the prisoner's counsel, at first, claimed the right of peremptorily challenging thirty-five jurors; but, that being an offence set forth in the penal law, was expressly embraced by the provision limiting the peremptory challenges to twenty; and the claim was, accordingly overruled.] 2

The amount of the evidence was, that the prisoner, being the owner of the schooner Enterprise, lying at Baltimore, determined to make a voyage to Porto Bello, and to take with him a cargo of goods, which he and Butler were to purchase on credit. In June, 1805, he applied to Captain Snyder of Baltimore, to get the insurance effected for him, valuing her at 2700 dollars. Snyder, after objecting to the danger of the voyage, but advising, that in case he should persist in it, that he should take a particular route, so as to avoid the St. Domingo privateers, which he would fall in with, by passing between that island and Cuba, called the Moro passage; and being assured by the prisoner, that he intended, and should pursue the route thus advised; agreed to get the insurance done, and to give his notes for the premium, which he accordingly effected. The prisoner also applied to Snyder, to effect an insurance on the cargo, valued at 12000 dollars. Snyder expressed his surprise, that the prisoner and his partner could get credit for so large a quantity of goods, but was assured, that there would be no difficulty. Snyder accordingly agreed upon the premium, and gave his notes for the amount of this sum, insured on the cargo By the manifest of the cargo taken on board, it was stated at 9690 dollars. It appeared by the testimony of Snyder, that the prisoner purchased from him a spike gimlet, at the price of twenty-five cents, but the precise bore could not be ascertained. He sailed on the voyage, and it appeared by the testimony of one of his sailors, that there was no opportunity, during the passage to sea, for him to unlade any part of his cargo. He was met with, not far from Cuba, by a French privateer, who took the captain and all his hands on board the privateer, and put the whole of them except Taylor, the witness for the prisoner, under the hatches. This witness stated, that for three hours, the boat was constantly passing to, and returning from the Enterprise, and at one of the trips, though surrounded by the privateersmen generally, he saw goods and packages in the boat. The captain and crew were afterwards permitted to return to their vessel. On going on board, they found all the hatches open; great destruction appeared; and the store room, fixed between the two bulk heads, in which all the dry goods had been deposited, entirely emptied. They made sail, and the next day, about twenty hours after they had

2 [From 4 Dall. 412.]　　　　2 [From 4 Dall. 412.]

left the privateer, they perceived the vessel to leak. It gradually increased, and at eleven at night, all hands were called on deck; but by twelve she was cleared, after which, the witness declared they could not free her by constant pumping. The next morning, the water covered the cabin floor; and about seven o'clock they all abandoned her, waterlogged, having only time to take with them, a small piece of raw, and another of boiled beef, and a small quantity of bread. At this time, they were in sight of land, which they reached that afternoon. Not finding water where they landed, they coasted along, and in about thirty-six hours, reached St. Jago de Cuba.· In a day or two after, Captain Hughes, of the Friendship, met with the Enterprise at sea, her decks covered, and the water flowing through the hatches. He went on board, and by pumping, relieved her so, that with great difficulty, he was able to tow her to the Moro castle. He found her sails cut, and her light sails gone. With the assistance of ten or a dozen hands, obtained from a garde de costa, lying at the castle, and two pumps, he entirely freed her of water, in about eight hours, and then perceived three auger holes in her bottom, about the size of his forefinger to the knuckle, near the keel, and in the store room, the ceiling having been first cut away. After stopping these holes, the schooner was perfectly tight. He carried her up the next day to St. Jago, and moored her about fifty yards from a vessel, in which he saw the prisoner then standing. The prisoner never, at any time, came on board the Friendship, or made any inquiries respecting his vessel, except that the day after she came up, he inquired of one of Captain Hughes's sailors, without any question from the sailor leading to it, where the holes were. Captain Hughes applied to the consul, who sent a letter to the prisoner to attend at his office. He there offered to compromise with Hughes, which he refused, but charged the prisoner with having destroyed the vessel. This the prisoner denied. The cargo was taken possession of by the government, and after twenty days' public notice, was sold, with the vessel, producing eleven or twelve hundred dollars. Hughes put in his claim, which was not admitted, but the proceeds were retained, and the claim of Hughes is still pending. None of the witnesses ever saw the prisoner at the coffee house, where the Americans resorted, or in company with any of them, whilst at St. Jago. Mr. Douglass advised the prisoner to clear up the reports which were circulating, that he caused the destruction of the vessel. This he promised to do, but never took any step in the business. When first charged with the fact by Hughes, he said, he was not insured—said the holes were made by the privateersmen, who had robbed him ·of goods to the amount of 6100 dollars. At another time, he said they had robbed him of goods to the amount of 12000 dollars. The French privateer arrived at St. Jago about this time, ¸

and one of the officers called upon Hughes to go with him in search of Johns. They went to a house where they understood he lodged. Saw him pass from the front to the back room, but he was denied by the keeper of the house. The prisoner never attended at the sale of the vessel and cargo, or at all interfered to interpose his claim. He never gave notice to Captain Snyder of the loss, or made an offer to abandon.

These were the circumstances relied upon to establish the guilt of the prisoner. On the other side, it was insisted, that they were too slight to convict him, and that there was good ground to suppose the holes to have been bored by the French privateersmen.

During the examination, the following points were made at the bar, and decided by the court: 1st. It was objected by the counsel for the prisoner, that any evidence should be given respecting the insurance on the cargo. That the act of congress only applies to the casting away, burning, or destroying, a vessel, by any other than the owner, or if by the owner, then it must be to the prejudice of the underwriters on the vessel, or the owners of the cargo, or the other owners of the ·vessel; provided the court should think itself at liberty to reject the word "if," which in that part of the sentence, which respects the owners of the cargo, or the other owners of the vessel, makes nonsense of the sentence.[3]

BY THE COURT. The law does not make it an offence in the owner to destroy his vessel, to the prejudice of underwriters on the cargo; and if it did, this is not charged in the indictment; and consequently no evidence can be given, to establish a charge against the defendant, for a destruction to the prejudice of underwriters on the cargo. But the attorney may nevertheless give evidence, and so may the defendant, of the cargo being insured, and the value of it, in order to show the quo animo, the motive which might have influenced the defendant to destroy. or to save the vessel. If the cargo was greatly overvalued, it might suggest a motive to the prisoner for destroying the vessel; and the reverse, if not overvalued; and still more if undervalued.

The district attorney offered to read the policy of insurance on the vessel, which was objected to, without producing the charter of incorporation of the Baltimore Insur-

---

3 The words are: "If any owner of a ship or vessel, shall wilfully cast away, burn, or otherwise destroy said ship or vessel, with intent to prejudice any person who hath underwrote, or shall underwrite any policy thereon; or of any owner or owners of goods laden therein: or of any other owner or owners of the said vessel, he shall suffer death," &c. &c. This section is intended to be almost a literal transcript of the fourth and eleventh of George I.: except that those statutes say, "to the prejudice of any person, &c.; or of any owner or owners," &c. But, in this law, the words are changed to "with intent to prejudice:" and "if" is inserted instead of "of." But, to make sense of it, the word "if" must be entirely expunged.

ance Company. 2 Ld. Raym. 1532; 1 Bos. & P. 40.

BY THE COURT. The gist of the offence is, that the vessel was destroyed to the prejudice of this company. Unless a valid insurance was made, it could not be to the prejudice of this company, as laid in the indictment. To prove that the company can act under, and be bound by a common seal, it must appear that they are legally incorporated and authorized so to act. That the president pro tempore, who affixes the seal, could thereby bind them. The charter of incorporation, therefore, must be produced.

It was accordingly read.

Mr. M'Kim, the president of the Baltimore Insurance Company, was now offered as a witness, to prove the handwriting of the defendant, to the manifest of the cargo. He was objected to, as being a stockholder, and therefore interested to convict the prisoner. 1 P. Wms. 595; 1 Macn. Ev. 52, 53, were read.

BY THE COURT. The conviction of the prisoner would be no evidence, in a suit on the policy, against the company, and therefore the witness is not interested.[4]

Upon producing the act of the state of Maryland, incorporating the Baltimore Insurance Company before mentioned, it was certified by the clerk of the executive council, and the seal of the state was annexed. This was objected to, because it did not appear, that it was authenticated by an officer, who had power to do it, and to affix the seal of the state.

BY THE COURT. The act of congress, as to all public acts of judicial bodies and others, except the laws or acts of a state, directs who is to authenticate them; but as to the latter, it merely requires the seal of the state to be annexed. This law, being so authenticated, is proper evidence, within the true construction of the act of congress.[5]

The points of law, raised in the argument, were as follows:

1st. That a vessel cannot be said to be "cast away or destroyed," if she is afterwards recovered and restored to her former situation. A vessel was stranded by the captain, and was afterwards got off: upon an indictment against the captain, under St. 4 Geo. I. c. 12, and 11 Geo. I. c. 29, it was determined, that if a vessel be run aground, or stranded on a rock, to defraud underwriters, and is got off in a condition to be easily refitted, she cannot be said to be cast away, or destroyed. East, P. C. 1097, 1098, decided in 1765. Johnson's Dictionary was quoted. Cast away, means to shipwreck; shipwreck is to destroy, by dashing on rocks or sands. Wreck is where a ship perishes. In this case, the vessel was easily repaired; and by pumping, and plugging the holes, was as tight and staunch as ever.

2d. That presumptive evidence is not sufficient to convict the prisoner; and to prove this, the counsel read 8 Mod. 66, 67, 74.

3d. That the indictment states, that the prisoner destroyed the vessel with intention to prejudice the insurance company, and to gain corrupt advantage to himself; whereas it was proved, that the vessel was not insured for a farthing more than she was worth.

4th. The words of the law are, "to prejudice any person or persons who hath underwrote;" but a corporation is not a person, or persons. Plowd. 177; 1 Leach, 215, 2 Strange, 1241.

In answer to this last point, Mr. Dallas cited 1 Wood. El. Jur. 195; 1 Mod. 164; 2 Inst. 702, 703.

5th. The indictment states the prisoner to be owner of a certain ship or vessel, called the Enterprise of Baltimore; that the company insured said ship or vessel, called the Enterprise, not saying "of Baltimore." The objection taken, was twofold: 1st, the variance; and 2d, her being called a vessel or ship in the disjunctive. An indictment that A forged, or caused to be forged, is bad. 2 Hawk. P. C. c. 25, § 58; 2 Rolle, Abr. 80; 5 Mod. 138.

6th. To prove that Captain Hughes, the salvor, was interested, so far at least as to discredit him, it was contended; that if the Enterprise was voluntarily injured and abandoned, she became a derelict, and belonged to the first finder; and of course, if Hughes should be able to convict the defendant, he would be entitled to recover from the Spanish government, the whole proceeds of the vessel and cargo: aliter, if she be abandoned from a necessity, not voluntarily produced by the master or owner, 2 Bl. Comm. 89; 2 Vern. 317; Leach, 207, were read.

---

[4] This opinion is supported by the cases of Rex v. Bray. Cas. t. Hardw. 358; Rex v. Boston, 4 East. 572; Abrahams v. Bunn, 4 Burrows. 2251; Smith v. Prager. 7 Term R. 60; Masters v. Drayton. 2 Term R. 496. See, also, Phil. Ev. 38, 87. The only exception appears to be the case of forgery; and this is considered as an anomaly, and is much shaken by a case decided in New-York. 1 Phil. Ev. 90. I have no doubt that it ought to be now overruled. Whether a conviction in a criminal proceeding can be given in evidence in a civil action, is vexata questio. 2 Phil. Ev. 237.

[5] As to the proof of entries in public books, it is clearly settled, that where an original is of a public nature, and admissible in evidence, an examined copy will equally be admitted. 2 Phil. Ev. 320. It is a general rule, that a copy, authenticated by a person appointed for that purpose, is good evidence of the contents of the original, without proof of its being examined. Id. 292. Where a deed is by law to be enrolled, the endorsement by the proper officer on the back, is evidence of enrolment. Id. Examined, sworn copies of all acts of a public nature, may be given in evidence. Gilb. Ev. 47; Peake, Ev. 24. It would seem, on the whole, that an office copy, certified, is not sufficient, unless the officer is expressly authorized to give copies, though he be the keeper of them, and is authorized to record the original—They must be examined and proved in the ordinary way to be copies.

Before WASHINGTON, Circuit Justice, and PETERS, District Judge.

WASHINGTON, Circuit Justice (charging jury.) The court think it unnecessary to give an opinion upon these objections, which appear upon the face of the indictment, and particularly that which is made to a corporate body, being included in the words "person or persons," because the defendant may avail himself of them, should he be found guilty, on a motion in arrest of judgment. As to the third objection, that he is stated to have destroyed his vessel, with a view to gain corrupt advantage to himself, &c. these words are merely surplusage, and need not have been proved. The intent to defraud the underwriters, it was necessary to state, and it is stated.

Before the prisoner can be found guilty, you must be satisfied of the following facts: 1st. That Johns was the owner of the Enterprise: this is acknowledged. 2d. That she was insured: this is proved. 3d. That she was cast away, or otherwise destroyed. This is a mixed question of law and fact. The question of law is new; and in giving a legal definition of those words, we have very few sources of information to resort to. But after the fullest consideration, which we have been able to give the question, we are of opinion, that to "destroy a vessel" is to unfit her for service, beyond the hopes of recovery by ordinary means. This, as to the extent of the injury, is synonymous with "cast away;" it is the general term. Casting away is, like burning, a species of destruction. Both of them mean such an act as causes the vessel to perish; to be lost; to be irrecoverable by ordinary means. Whether, upon the evidence, and agreeable to this definition, the Enterprise was cast away or destroyed, is a matter of fact for your decision. 4th. That the prisoner perpetrated the act, or directed or procured it to be done, positive evidence is not necessary. Circumstantial evidence is sufficient, and is often more persuasive to convince the mind of the existence of a fact, than the positive evidence of a witness, who may be mistaken; whereas a concatenation, and a fitness of many circumstances, made out by different witnesses, can seldom be mistaken, or fail to elicit the truth. But then those circumstances, should be strong in themselves, should each of them tend to throw light upon, and to prove each other, and the result of the whole, should be to leave no doubt upon the mind, that the offence has been committed; and that the accused, and no other, could be the person who committed it. Under these precautions, let the case of the prisoner be examined. The first we hear of him is at Baltimore, the owner of this vessel, and having it in contemplation to make a voyage, with a cargo belonging to one Butler and himself, to Porto Bello. He procures her to be insured by the Baltimore Insurance Company, at 2,700 dollars, and the witness, who was his friend on the occasion, and appearing on the part of the prosecution, declares that she was fully worth that sum. What motive, then, could he have to destroy her? He would not only be a loser in respect of the value of the vessel, but all his objects of trade, and all the profits which he no doubt anticipated, (for why else should he undertake the voyage?) would be thereby defeated. In the next place, we find him insuring 12000 dollars on a cargo, appearing by the manifest to be worth only 9,090 dollars. At first view, this appears an overvaluation, and consequently to afford a temptation to destroy the cargo. But since it does not appear, that the freight was insured, and since a man, without meditating a fraud, may wish to insure expected profits, he would probably be a loser even in respect of the cargo; or at any rate, there could exist little, if any temptation, to perpetrate the crime with which he is charged. We then follow him from Baltimore into the West India seas, and find him in the possession of French privateersmen; whose conduct, if the witness be believed, would prove them rather to deserve the name of pirates, It appears, by the testimony of the same witness, that the whole of the cargo taken in at Baltimore, fell into the hands of these men, and you will judge, from his evidence, whether any, and what part, was taken out by them. In about twenty hours after the prisoner and his crew were restored to the vessel, she was discovered to leak; the difficulty of freeing her increased; but yet we find, that in one hour, from eleven to twelve, she was freed; after which, every exertion was made in vain. It afterwards appeared, that the leak was produced by three holes bored in her bottom. These must have been made by the privateersmen, by Johns, or by some of his crew; because she was waterlogged when they abandoned her. If by the privateersmen, it is extremely difficult to account for her not leaking, for so long a time after her liberation, and that the leak should increase in the proportion it did, without any new apparent cause. I say it is difficult to account for this, unless we suppose, that after making the holes, they were imperfectly filled up, and afterwards forced open in succession, by the pressure of the water. As to this, you must be the proper judges. Still it is not clear, that the prisoner made the holes. The store room, it is true, communicated with the cabin; but it appears that the key generally remained in the door, and it is possible that opportunities may have offered for the crew to have done the act. These things are merely suggested for your consideration.

It is not less difficult to account for the prisoner's conduct, after he saw his vessel in safety at St. Jago. If he had not wished her destruction, nothing could have been more natural, than that he should immedi-

ately have inquired into the circumstances by which his vessel had been saved; into the causes which had produced her supposed loss, and that he should have taken steps to reclaim her. Instead of this, he at no time called upon the salvor, but, on the contrary, he seems to have taken pains to avoid him. When charged with being guilty of having done the act, and advised by his friend to clear it up, we find him contenting himself with a simple denial of the charge. He never appeared at the sale of the vessel or cargo, or interposed a claim for either. His inconsistencies; at one time declaring that he was not insured; sometimes saying, that he had been plundered of goods to the amount of 6000 dollars; at another, of 12.000 dollars; his avoiding the company of the Americans; being denied to persons, who came after him: can with difficulty be reconciled with the character of fairness—whether with that of innocence, you must decide. It is proper, however, to remark, that these circumstances do not necessarily prove more, than that he regretted the recovery of the vessel and cargo. · A man, whose property is fully, or more than covered, may not be sorry that it is lost; and yet he might be very far above the commission of a criminal act to produce the loss. It is for you to say, whether this construction should be given to his conduct. Upon the whole, you will weigh the evidence, and not convict the prisoner, if you doubt of his guilt.

Jury found the prisoner not guilty.